UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MARIA HIGGINS,

                              Plaintiff,

        -against-                                          5:12-CV-1379 (LEK)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.
_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have filed

briefs.  Dkt. Nos. 13 ("Plaintiff's Brief"); 14 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is vacated, and the case is remanded for

further proceedings consistent with this Memorandum-Decision and Order.

## II.    BACKGROUND

### A.  Plaintiff's Medical Records

On June 16, 2008, the alleged onset date of Plaintiff Maria Higgins's ("Plaintiff") disability,

Plaintiff injured the left side of her neck.  Dkt. No. 9 ("Record") at 42, 372.[1]  According to medical

records, "[s]he was lifting, pushing, and pulling at work . . . when it happened."  Id. at 372.  On July

16, 2008, Plaintiff also injured the right side of her neck while "lifting a heavy object at work."  Id.

at 42.  Plaintiff reported that both incidents contributed to her ultimate injury.  Id. at 43.  Plaintiff

---

[1] Citations to the Record are to the pagination assigned by the Social Security
Administration.

did not return to work after July 16, 2008.  Id. at 42.

On June 18, 2008, Radiologist Bernard N. Raasch reviewed Plaintiff's x-rays and found "[m]arked degenerative changes at C5-C[6][2] and C6-C7 with mildly decreased disc spaces and large interior spurs." Id. at 375.  Dr. Raasch noted the existence of small posterior spurs, mild retrolisthesis, and reversal of normal cervical lordosis.  Id.  On July 3, 2008, Plaintiff received treatment from Dr. Ethan Flaks at North Medical Center Family Physicians.  Id. at 285.  After diagnosing Plaintiff with cervical radiculopathy, Dr. Flaks prescribed Flexeril and Ibuprofen.  Id.

Plaintiff saw Dr. John Cambareri three times in July 2008 at Syracuse Orthopedic Specialists ("SOS").  Id. at 360, 364, 371.  On July 17, 2008, Plaintiff reported experiencing moderate knife-like and burning pain in the posterior and left side of the neck and shoulder that was worsened with activity, lifting, and reaching.  Id. at 371.  Dr. Cambareri identified moderate global loss of motion in Plaintiff's neck and tenderness to palpation of the left and right paravertebral muscles.  Id. at 373. He diagnosed Plaintiff with cervical sprain, cervical radiculopathy, and cervical spasm.  Id. at 374. Dr. Cambareri also reviewed Plaintiff's x-rays and found that she had "advanced degenerative disc disease at C5-6 and at C6-7 with decreased disc spaces, spurs and foraminal narrowing at both levels," along with retrolisthesis.  Id.  Plaintiff returned on July 24, 2008 with pain in the right shoulder and arm area, cervical spine, and lumbar spine.  Id. at 364.  Plaintiff's radiographs showed narrowing at C5-6 with anterior spurs, a decrease in cervical lordosis, some narrowing at C6-7, and "fairly significant degenerative facet disease at L5-S1 bilaterally with spurs throughout the LS spine." Id. at 369.  On July 31, 2008, Plaintiff again sought treatment from for pain in her bilateral shoulder and arm area, cervical spine, and lumbar spine.  Id. at 360.  Plaintiff also reported tingling

---

[2] Dr. Raasch wrote "C5-C5."

2

in her left hand and forearm.  Id.

Dr. Cambareri recommended physical therapy.  Id. at 363, 368, 374.  Plaintiff participated in thirty-eight physical therapy sessions for neck and shoulder pain at West Side Physical & Aquatic Therapy, P.C., from July 29, 2008, to December 8, 2008.  Id. at 291-312.  On December 8, 2008, James A. Gauthier, PTA, advised that Plaintiff continue with therapy.  Id.

Dr. Cambareri also referred Plaintiff to radiologist John Van Slyke for an MRI of her cervical spine.  Id. at 376.  Dr. Van Slyke found "moderately advanced degenerative disc disease [at] C5-6 and C6-7" and "only minimal degenerative disease throughout the remainder of the cervical spine."  Id.  He also diagnosed Plaintiff with "mild posterior osteophyte/disc complex mildly narrowing the spinal canal but not causing cord or nerve root compression."  Id.  Dr. Cambareri noted his agreement with Dr. Van Slyke's report on August 12, 2008.  Id. at 358.

Dr. Cambareri treated Plaintiff twice more before December 2008.  Id. at 345, 350.  On September 23, 2008, Plaintiff complained of bilateral pain in her shoulder, arm area, and cervical spine, and numbness of her upper extremities.  Id. at 350.  Plaintiff categorized the pain level as mild, and Dr. Cambareri noted that Plaintiff's condition seemed to be improving.  Id.  However, Plaintiff continued to experience moderate global loss of motion in her neck.  Id. at 352.  Dr. Cambareri assessed Plaintiff as having a cervical sprain, cervical radiculopathy, and paresthesia and numbness in the upper extremities.  Id.  On November 4, 2008, Plaintiff saw Dr. Cambareri again with additional complaints regarding her shoulder, neck, and wrists.  Id. at 345.  The pain's severity remained mild, and Plaintiff's progression remained steady.

Plaintiff saw Dr. David R. Reich on December 4, 2008, to determine whether she had carpal tunnel syndrome ("CTS").  Id. at 462.  Dr. Reich's tests indicated that Plaintiff had "mild to

minimal left-sided CTS, and borderline (perhaps nascent) [CTS] on the right side." Id. at 464.

Accordingly, Dr. Reich suggested nocturnal braces and additional testing in three to four months.

Id. Plaintiff saw Dr. Cambareri on December 9, 2008, for an evaluation of Dr. Reich's testing and

examination. Id. at 341. In addition to cervical sprain and cervical radiculopathy, Dr. Cambareri

diagnosed Plaintiff with bilateral CTS. Id. at 344. Dr. Cambareri recommended that Plaintiff

discontinue physical therapy, wear wrist braces, and see Dr. Rina Davis for another opinion. Id.

On December 18, 2008, Dr. Rina C. Davis treated Plaintiff at New York Pain Center to

evaluate Plaintiff's neck, shoulder, and arm pain. Id. at 381. Plaintiff described burning pain in her

shoulders, stabbing pain in her neck, and dull pain in her wrist. Id. Plaintiff stated that the pain was

constant and exacerbated by reading, driving, and household activities. Id. The reported severity of

pain varied; on a good day, and with use of pain medication, it rated a two on a ten point scale, and

six on a bad day. Id. On the day of her appointment with Dr. Davis, Plaintiff rated the pain as a

two. Id. Plaintiff reported no change in symptoms after wearing the braces Dr. Cambareri had

suggested. Id. Dr. Davis's physical examination revealed a mildly tender "palpable trigger point in

her right middle trapezius" and a decreased range for right rotation in Plaintiff's neck. Id. at 382.

Dr. Davis diagnosed cervical degenerative disc disease and CTS, and sought authorization for a

cervical interlaminer nerve block. Id. at 383. As Dr. Davis recommended, Plaintiff continued

physical therapy and attended Fitness Forum Physical Therapy from January 13, 2009, to August 8,

2009. Id. at 470-86.

Between January 2009, and May 2009, Plaintiff had several appointments with Drs. Davis

and Cambareri. Id. at 318, 325, 329, 333, 337, 465. Plaintiff underwent the first scheduled nerve

block, but declined to continue with further blocks after the first produced headaches and provided

no benefit.  Id. at 318, 332.

At the request of Dr. Cambareri, Plaintiff then went to SOS to see Dr. Thomas Haher on June 17, 2009.  Id. at 435.  Plaintiff reported neck and bilateral shoulder pain radiating into the upper extremities, bilateral wrist pain, and paresthesia in her hands and fingers.  Id.  Dr. Haher diagnosed Plaintiff with neck pain and noted that her MRI showed "discogenic disease at 5-6 and 6-7."  Id. at 437.

On July 27, 2009, Dr. Cambareri noted that Plaintiff's pain level had decreased since participating in physical therapy and, generally, "the progression of the problem seems to be getting better."  Id. at 431.  Plaintiff's neck exam revealed tenderness to palpation of the left and right paravertebral muscles, as well as a mild spasm in the left and right paravertebral muscles.  Id. at 433.  According to Dr. Cambareri, Plaintiff "can lift very occasionally up to five pounds and carry up to five pounds occasionally.  She may occasionally crawl but not climb or reach above shoulder height.  She may bend and squat frequently.  She can push and pull but not continuously.  She may do simple grasping and fine manipulation."  Id. at 434.

After Plaintiff completed her application for disability benefits, the SSA's Division of Disability Determination referred Plaintiff to Dr. Kalyani Ganesh for an orthopedic examination.  Id. at 385.  Dr. Ganesh noted cervical pain and "tenderness in the right trapezius and right paravertebral muscles or paravertebral spine."  Id. at 386.  Dr. Ganesh concluded that Plaintiff had a history of chronic neck pain, mild carpal tunnel on the left wrist, and a pinched nerve.  Id. at 387.  According to Dr. Ganesh, Plaintiff had "[n]o gross limitation sitting, standing, or walking.  Mild to moderate limitation lifting, carrying, pushing, and pulling."  Id.

On September 4, 2009, S. Putcha with the State agency undertook a physical residual

functional capacity ("RFC") assessment of Plaintiff. Id. at 388-93. The assessment indicated that Plaintiff could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; sit (with normal breaks) for a total of about six hours in an eight hour workday; and push and/or pull with no additional restrictions. Id. at 389. Consultant Putcha stated Plaintiff's "complaints are related to medically determinable impairments, but not to the extent given and they are considered partially credible." Id. at 391-92.

Dr. Cambareri examined Plaintiff again on September 8, 2009, and November 10, 2009, for pain in her cervical spine. Id. at 423, 427. At both appointments, Dr. Cambareri noted Plaintiff's "problem seem[ed] to be getting better." Id. at 423, 427. Still, Dr. Cambareri's neck examinations revealed tenderness to palpation of the left and right paravertebral muscles. Id. at 425, 429. In September 2009, Dr. Cambareri found no spasm in the neck, and Plaintiff did not mention a spasm in November 2009. Id. at 425, 429. On November 10, 2009, Dr. Cambareri described Plaintiff's pain as "consistent with the history of the injury." Id. at 426. In November 2009, Plaintiff began to undergo physical therapy two to three times per week at Community General Hospital, and continued until May 2010. Id. at 495-501.

On December 22, 2009, Dr. Cambareri treated Plaintiff for pain in her cervical spine and her bilateral CTS. Id. at 419, 422. Dr. Cambareri's notes explain that Plaintiff had double-crush syndrome as a result of pinched nerves in the neck and an element of pinched nerves at the carpal canal bilaterally. Id. Dr. Cambareri believed Plaintiff's "bilateral [CTS] is the direct result of the injury to the neck which was a direct result of the injury that occurred at work on [June 16, 2008]." Id.

6

Michael L. Boucher, Ph.D., performed a psychological evaluation of Plaintiff on January 26, 2010, after a referral by New York State Vocational and Educational Services for Individuals with Disability ("VESID"). Id. at 488. Dr. Boucher's tests showed that Plaintiff suffered from Mathematics Disorder and Attention Deficit Hyperactivity Disorder (ADHD), Predominantly Inattentive Type. Id. at 491. Dr. Boucher believed the Plaintiff could succeed in a technical school or college program if she received supportive educational services and appropriate testing accommodations. Id.

On June 10, 2010, Dr. Richard Rozanski of SOS performed and interpreted the results of a second MRI. Id. at 552. At C3-C4, Dr. Rozanski found "minimal disc bulge and uncinate spurring" with no stenosis. Id. At C4-C5, Dr. Rozanski noticed "marked disc narrowing and desiccation" and "[m]arked hypertrophic bony spurring of vertebral bodies both ventrally, dorsally, and involving uncinated process." Id. Dr. Rozanski also found "[c]hronic broad-based bulge/protrusion combine[d] with bony element to contact and mildly flatten the cord," as well as "[m]oderate to marked bilateral foraminal stenosis." Id. At C6-C7, Dr. Rozanski found "moderate narrowing and desiccation again with disc bony complex resulting in moderate bilateral foraminal stenosis." Id. at 553. On June 25, 2010, Plaintiff saw Dr. Haher to discuss the MRI results. Id. at 550. After discussing the results, Dr. Haher offered Plaintiff the possibility of surgery because she continued to experience pain despite treatment and physical therapy. Id. at 551.

Plaintiff received treatment from Dr. Cambareri for pain in the cervical spine on August 12, 2010, and September 24, 2010. Id. at 502, 506. On August 12, 2010, Plaintiff told Dr. Cambareri she wanted to proceed with surgery. Id. at 509. Dr. Cambareri prescribed Plaintiff Norco. Id. The record indicates that Plaintiff saw Dr. Cambareri for the last time on September 24, 2010, as she

waited to receive a surgical appointment with another doctor.  Id. at 503.

Dr. Ross Moquin treated Plaintiff at Crouse Hospital for neck and arm pain on October 28, 2010.  Id. at 534.  His physical examination showed decreased range of motion in Plaintiff's neck and back, as well as some tenderness.  Id. at 535-36.  After the physical examination and review of the most recent MRI results, Dr. Moquin diagnosed Plaintiff with degenerative disc disease of the cervical spine and several disc herniations at C5-6 and C6-7.  Id. at 536.  Dr. Moquin told Plaintiff that she could be a surgical candidate if she stopped smoking tobacco.  Id.  In the interim, Dr. Moquin recommended that Plaintiff continue with physical therapy.  Id.

On November 4, 2010, Melissa Cullinan, RPA-C, examined Plaintiff under Dr. Haher's review.  Id. at 546.  Plaintiff rated the pain an eight on a ten point scale.  Id. at 547.  Ms. Cullinan noted that Plaintiff had "exhausted all conservative treatment measures," and that the "complaints are consistent with the history of the injury."  Id. at 547-48.  Plaintiff wanted to schedule her surgery.  Id. at 547.  On December 30, 2010, Plaintiff had a pre-operation appointment under Dr. Haher's review.  Id. at 542.  She reported that her pain had worsened since the last visit.  Id. at 543. X-rays obtained that day revealed "multi-level degenerative disease with decreased disc space and anterior osteophytes at C5, C6, and C7."  Id. at 545.

On January 6, 2011, Dr. Bruce Marmor medically cleared Plaintiff for surgery.  Id. at 540. On January 13, 2011, Dr. Haher operated on Plaintiff.  Id. at 558.  The surgery included an "anterior cervical discectomy and fusion C5-C6, C6-C7, discectomy C5-C6 and C6-C7, insertion[s] of peek implant[s,] . . . application of a 30 mm six hole plate, . . . [and] neurological monitoring."  Id.

**B. ALJ Hearing**

On June 11, 2009, Plaintiff protectively filed for disability insurance benefits, alleging

8

disability resulting from injury to her neck, shoulder, wrist, and hands from an onset date of June 16, 2008. Id. at 36, 69, 194, 230. After the SSA denied Plaintiff's application on September 10, 2009, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 80, 89. On October 8, 2010, ALJ Jennifer Whang conducted a hearing regarding Plaintiff's claim for Social Security Title II benefits.[3] Id. at 17-33.

Vocational expert ("VE") Richard Smith, Ph.D., testified about Plaintiff's previous work experience and answered hypotheticals posed by both the ALJ and Plaintiff's attorney. Id. at 23-31. Dr. Smith reported that, in the fifteen years prior to the hearing, Plaintiff worked as a cup maker, manager of a dry cleaner, and machine operator. Id. at 23-24. The ALJ asked Dr. Smith if a hypothetical claimant of Plaintiff's age, education, and experience, who could occasionally use ramps and climb stairs, with frequent but not constant handling and fingering with the bilateral upper extremities, and frequent rotation of the neck, could perform any past relevant work. Id. at 25. Dr. Smith replied that Plaintiff could work as a cup handler and manager, but not as a machine operator. Id. at 25-26.

Plaintiff's attorney then posed a hypothetical to Dr. Smith based on the limitations Dr. Cambareri listed, which included: occasional lifting of up to five pounds; occasional carrying of up to five pounds; and inability to reach above shoulder height. Id. at 29-30, 434. Dr. Smith testified that someone of Plaintiff's age, education, and training could not perform Plaintiff's past relevant work, given those limitations. Id. However, Dr. Smith believed that such a person could work alternatively as a ticket seller, cashier, order taker, or telephone quotation clerk. Id. at 30. Dr. Smith stated that if a person had an additional limitation of turning her head from side to side only

---

[3] Plaintiff was not present at this hearing. R. at 19.

9

occasionally, "It might be a bit of a push on some of those jobs." Id. at 31. Dr. Smith further opined that a person with an additional limitation that did not allow her to move her head down more than occasionally could not perform the jobs he previously mentioned. Id.

On January 28, 2011, Plaintiff attended a supplemental hearing before the ALJ.[4] Id. at 36-61. Plaintiff described the pain both before and after the surgery as a stabbing sensation in her neck that extends below her shoulders, as well as constant hurt and tingling in both hands. Id. at 48. She testified that her hands go numb if she drives for longer than approximately fifteen minutes, and has trouble completing tasks such as household chores and grocery shopping without pain and assistance from her husband. Id. at 41, 44. Plaintiff said she begins to feel pain if she remains seated for fifteen minutes, lifts her hands, or turns her head. Id. at 45, 48. Plaintiff also claims that she has had difficulty sleeping ever since her injuries occurred. Id. at 49.

After Plaintiff testified, Dr. Smith answered questions from the ALJ and Plaintiff's attorney. Id. at 51-60. The ALJ asked if a hypothetical claimant of Plaintiff's age, education, and experience could perform Plaintiff's past relevant work if she were limited to light work; required a sit/stand option allowing her to alternate between sitting and standing every thirty minutes; could frequently reach, including overhead reaching, handling, and fingering with the bilateral upper extremities; and could frequently rotate her neck. Id. at 54. Smith testified that a person could not perform Plaintiff's past relevant work, but could work as a ticket seller and in many assembly jobs. Id. at 55. When the hypothetical changed to sedentary work, Smith affirmed that a hypothetical person could not perform Plaintiff's past relevant work, but could work as an order clerk, telephone quotation

---

[4] The ALJ conducted the supplemental hearing by video, and a different attorney represented Plaintiff. R. at 36-37. The hearing was approximately two weeks after Plaintiff's surgery. Id. at 47, 558.

clerk, or surveillance system monitor with a high school education. Id. at 56. Dr. Smith stated if the individual could lift only five pounds, rather than the standard ten pounds, the availability of jobs would not change. Id. If an individual could only rotate her neck occasionally, rather than frequently, Dr. Smith said that the person could not work as a ticket seller or assembly person. Id. at 57. If the claimant further required unscheduled breaks and was expected to be off task for more than thirty percent of the day due to concentration issues, she could not perform any kind of work. Id. at 58.

When Plaintiff's attorney questioned Dr. Smith, he adjusted the limitations set forth in the ALJ's hypotheticals. Id. at 58-60. First, the attorney changed the ALJ's initial hypothetical concerning light work from frequent to occasional reaching, handling, and fingering. Id. at 58. Dr. Smith testified that, with this additional limitation, the hypothetical claimant could not perform as a ticket seller or work on an assembly bench. Id. at 58-59. Second, the attorney changed the limitations in the sedentary hypothetical from frequent to occasional reaching, handling, and fingering. Id. at 59. Dr. Smith stated that work as an order clerk or telephone quotation clerk[5] would not be an option, although work as a surveillance system monitor would be. Id. at 59-60.

**C. The ALJ's Decision**

After the hearing, the ALJ issued a decision on February 11, 2011. Id. at 64-75. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability, June 16, 2008. Id. at 69. The ALJ determined that while Plaintiff had the severe impairments of degenerative disc disease in the cervical spine and mild CTS, Plaintiff did not have

_____

[5] Although Dr. Smith used the term "information person," the Court interprets "information person" to mean telephone quotation clerk based on Dr. Smith's previous answers.

an impairment or combination of impairments that met or medically equaled a listed impairment in

20 C.F.R. § 404(P), Appendix I. Id. at 69-70. The ALJ further found that Plaintiff has the RFC to

perform sedentary work, but: cannot not lift more than five pounds;

> requires a sit/stand option, allowing her to alternate between a sitting and standing
> position every thirty minutes; can occasionally use ramps and climb stairs, but can never
> climb ladders, ropes, or scaffolds; can do frequent but not constant reaching, including
> overhead reaching, handling and fingering with the bilateral upper extremities; can do
> frequent but not constant rotation with the neck; should avoid concentrated exposure to
> fumes, odors, dusts, gases, and poor ventilation; and should avoid hazards, including
> moving machinery and unprotected heights.

Id. at 71. The ALJ indicated that these limitations rendered Plaintiff unable to perform any past

relevant work. Id. at 73. However, given Plaintiff's age, education, work experience, and RFC, the

ALJ found that there were jobs that existed in significant numbers in the national economy that

Plaintiff could perform. Id. at 74. Therefore, the ALJ concluded that Plaintiff was not disabled by

the standards set forth in the Social Security Act. Id. at 75.

Plaintiff filed a request for review on February 21, 2011. Id. at 12. On July 26, 2012, the

ALJ's decision became the final decision of the Commissioner of the SSA ("Commissioner") when

the Appeals Council denied the request for review. Id. at 1. Plaintiff timely filed an appeal on

August 7, 2012. Dkt. No. 1 ("Complaint").

## III. LEGAL STANDARD

### A. Standard of Review

When the Court reviews the SSA's final decision, it determines whether the ALJ applied the

correct legal standards and if her decision is supported by substantial evidence in the record. 42

U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than

a mere scintilla," and it must reasonably support the decision maker's conclusion.  Halloran v.

Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

The Court defers to the Commissioner's decision if it is supported by substantial evidence, "'even if

it might justifiably have reached a different result upon a *de novo* review.'"  Sixberry v. Colvin, No.

12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of

Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).  However, the Court should not

uphold the ALJ's decision when there is substantial evidence, but it is not clear that the ALJ applied

the correct legal standards.  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B.  Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months."  20 C.F.R. § 404.1505(a).  An individual seeking disability benefits

"'need not be completely helpless or unable to function.'"  De Leon v. Sec'y of Health and Human

Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463

F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in

the SSA's five-step sequential evaluation process.  20 C.F.R. § 404.1520(a)(1).  In the first four

steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA.  Kohler v.

Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).

If the SSA is able to determine that the claimant is disabled or not disabled at any step, the

evaluation ends.  20 C.F.R. § 404.1520(a)(4).  Otherwise, the SSA will proceed to the next step.  Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).  If it does, the claimant is not disabled under SSA standards.  Id.  At step two, the SSA considers whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509.  Id. at § 404.1520(a)(4)(ii).  If she does not have such an impairment, the claimant is not disabled under SSA standards.  Id.  At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. § 404(P), Appendix I.  Id. at § 404.1520(a)(4)(iii).  If it does not, the SSA moves on to step four to review the claimant's RFC and past relevant work.  Id. at § 404.1520(a)(4)(iv).  The claimant is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work.  Id.  If the claimant cannot perform her past relevant work, the SSA decides at step five whether adjustments can be made to allow claimant to work somewhere in a different capacity.  Id. at § 404.1520(a)(4)(v).  If appropriate work does not exist, then the SSA considers the claimant to be disabled.  Id.

IV.    **DISCUSSION**

Plaintiff argues that: (1) the ALJ failed to evaluate the opinion of her treating physician, Dr. Cambareri; (2) the ALJ's determination of Plaintiff's credibility is unsupported by substantial evidence; and (3) the ALJ's Step 5 determination is unsupported by substantial evidence.  Pl.'s Br. at 1.

**A.  The Treating Physician Rule and Step 5 Determination**

The treating physician rule is triggered because Plaintiff's treating physician, Dr. John

14

Cambareri, offered his opinion on Plaintiff's limitations. R. at 434. Contrary to what the ALJ wrote in her decision, consultative medical examiner "Kalyani Ganesh, M.D. was [not] the only physician who issued an opinion as to the claimant's functional capacity." Id. at 73. While it is the Commissioner who determines whether the claimant is disabled, the ALJ must consider the treating physician's opinion. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Therefore, the Court finds that: (1) the ALJ failed to address the opinion of Plaintiff's treating physician, Dr. Cambareri; and (2) this error requires remand.

According to SSA guidelines, an ALJ will assess every medical opinion she receives. 20 C.F.R. § 404.1527(c)(2). A treating physician's opinion will receive controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] record." Id. In the ALJ's decision, she must provide "good reasons" for the weight she assigns to the treating physician's opinion. Id.; Halloran, 362 F.3d at 32 (citations omitted). If the treating physician does not receive controlling weight, the ALJ is required to explain why, considering:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32; see also 20 C.F.R. § 404.1527(c)(2). The Second Circuit stated that it will "not hesitate to remand" if the ALJ does not include these explanations. Halloran, 362 F.3d at 33; see also Ryan v. Astrue, 650 F. Supp. 2d 207, 212 (N.D.N.Y. 2009) (Kahn, J.). The Court may also be required to remand if an ALJ does not include "good reasons" in her decision for discounting the treating physician's opinion. Walsh v. Colvin, No. 12-CV-00933, 2014 WL 1239117, at *10

(N.D.N.Y. Mar. 25, 2014) (citations omitted).

Dr. Cambareri's opinion should have been addressed and given weight in the ALJ's decision. He meets the requirements of a treating physician as a doctor "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." Schisler v. Sullivan, 3 F.3d 563, 569 (2d Cir. 1993). He saw Plaintiff approximately twenty times, R. at 325-74, 406-34, 502-33, and guidelines dictate that more weight should be given to a source who has treated a plaintiff more frequently and for a longer period of time. Id. at § 404.1527(c)(2)(i). While the ALJ wrote that she made her decision having "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p," R. at 71, boilerplate language indicating compliance with regulations is not sufficient, Walsh, 2014 WL 1239117, at *16. Here, not only did the ALJ decline to give Plaintiff's treating physician controlling weight, but she also failed to directly address his opinion or provide reasons for not affording it proper weight. This failure is grounds for remand. See Dunker v. Astrue, No. 11-CV-321A, 2014 WL 297100, at *9-10 (W.D.N.Y. Jan. 27, 2014) (remanding a case in which the ALJ neither gave "good reasons" for failing to credit the treating physician's assessment nor addressed the assessment in the decision).

A remand is not always required when an ALJ fails to afford proper weight to the treating physician's opinion. See Perez v. Astrue, 907 F. Supp. 2d 266, 273 (N.D.N.Y. 2012); Ryan, 650 F. Supp. 2d at 217. An ALJ's failure to discuss a relevant medical record can be harmless if there is no evidence that Plaintiff's physical problems were disabling. Duvergel v. Apfel, No. 99 Civ. 4614, 2000 WL 328593, at *11 (S.D.N.Y. Mar. 29, 2000). Additionally, while "a hearing officer should always discuss a treating physician's record," the failure to do so is harmless if the treating

physician's report supports the ALJ's decision.  Perez v. Astrue, 907 F. Supp. 2d at 273.  Harmless

error may also lie where a treating physician's opinion does not receive the appropriate weight if "an

analysis of weight by the ALJ would not have affected the outcome."  Ryan, 650 F. Supp. 2d at 217

(citations omitted).  Ultimately, an error is harmless "where application of the correct legal

principles to the record could lead to only one conclusion."  Johnson, 817 F.2d at 986; see also

Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010).

Here, the ALJ's omission of Dr. Cambareri's opinion in determining Plaintiff's RFC was not

harmless error.  Dr. Cambareri's assessment included a limitation that Plaintiff "can lift very

occasionally up to five pounds and carry up to five pounds occasionally," and that she is unable to

reach above shoulder height.  R. at 434.  These limitations are not reflected in the ALJ's RFC

determination, and they are noteworthy differences.[6]  Plaintiffs who receive an unfavorable ruling

"are entitled to be told why the Commissioner has decided—as under appropriate circumstances is

his right—to disagree with" the opinions of their treating physicians.  Snell, 177 F.3d at 134.  While

Defendant attempts to explain why the ALJ discounted Dr. Cambareri's opinion, "[a] reviewing

court 'may not accept appellate counsel's post hoc rationalizations for agency action.'"  Id. (quoting

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

Further, if the ALJ had accepted Dr. Cambareri's list of Plaintiff's limitations, the outcome

might have been different.  See Dunker, 2014 WL 297100, at *9.  For example, Dr. Cambareri

noted that Plaintiff was unable to reach above shoulder height.  R. at 434.  In neither hearing did the

---

[6] Dr. Ganesh stated that Plaintiff has "[m]ild to moderate limitations lifting, carrying, pushing, and pulling.  R. at 387.  However, the ALJ determined "the medical evidence shows that [Plaintiff] is more limited than Dr. Ganesh determined."  Id. at 73.

ALJ include this limitation in a hypothetical to the VE.[7] Id. at 25-28, 54-58. Rather, the ALJ's

hypothetical involved a claimant who "can do frequent but not constant reaching including overhead

reaching." Id. at 54, 56. Dr. Cambareri's assessment also included further limitations in frequency

that the ALJ did not pose to Dr. Smith. Id. at 54-58. It is not sufficient, as Defendant suggests, that

the ALJ's hypotheticals included portions consistent with Dr. Cambareri's assessment. See

Kennedy v. Astrue, No. 09-CV-0670, 2010 WL 2771904, at *4 (N.D.N.Y. June 25, 2010), report

and recommendation adopted by, No. 09-CV-0670, 2010 WL 2771895, at *1 (N.D.N.Y. July 12,

2010) (Kahn, J.) (rejecting defendant's contention that the ALJ "implicitly considered" the treating

physician's assessment when the ALJ referenced his reports but did not provide an analysis of the

treating physician's opinion). Neither can the Court's "searching review of the record" provide an

appropriate substitute for the failure to analyze the treating physician's opinion. See id. Therefore,

because the ALJ's failure to consider Dr. Cambareri's opinion is not harmless error, remand is

warranted.

On remand, the ALJ must address Dr. Cambareri's assessment and provide "good reasons"

for assigning it the weight it receives. See 20 C.F.R. §404.1527(c)(2). Because Dr. Cambareri's

limitations conflict with the limitations Dr. Ganesh enumerated, the ALJ should examine the

medical reports to determine whether substantial evidence supports Dr. Cambareri's findings. See

Halloran, 362 F.3d at 32; see also Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983)

(explaining that a consultative medical examiner's assessment may amount to substantial evidence

_____

[7] At the first hearing, Plaintiff's attorney did pose a hypothetical to Dr. Smith that included
this limitation. R. at 29-30. The hypothetical did not include all of the limitations the ALJ posed to
Dr. Smith at the second hearing. Id. at 51-58. As a result, neither Plaintiff's attorney nor the ALJ
presented Dr. Smith with a complete hypothetical.

that contradicts an otherwise binding treating physician's opinion) (internal citations omitted); Smith v. Colvin, No. 12-CV-01169, 2014 WL 1746054, at *7 (W.D.N.Y. May 1, 2014) (noting that a consulting source's opinion can be substantial evidence if it is consistent with the record, particularly when the consulting source has directly evaluated the claimant). If Dr. Cambareri's opinion does not receive controlling weight, the ALJ must explain her reasons by discussing the factors laid out in 20 C.F.R. § 404.1527(c)(2)-(6). This assessment will help ensure that the RFC is "based on all of the relevant medical and other evidence." Id. at § 404.1545(a)(3).

Additionally, because the ALJ did not properly consider the medical evidence, the Step 5 determination was not supported by substantial evidence. The ALJ used the incomplete limitations as the basis for the questions she posed to Dr. Smith to determine "whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and [RFC]." R. at 74. For reasons discussed *infra*, the VE's ultimate opinion could have been different had the questions included Dr. Cambareri's limitations. Furthermore, if a hypothetical presented to the VE does not include "the full extent of [the claimant's] physical disabilities[,] . . . the record provides no basis for drawing conclusions about whether [the claimant's] physical impairments . . . render him disabled." De Leon, 734 at 936. Accordingly, on remand, the ALJ must consider and weigh Plaintiff's treating physician's opinion, and include all of Plaintiff's limitations when positing hypotheticals to the VE.

### B. Credibility Determination

Pursuant to 20 C.F.R. § 404.1529, the ALJ must evaluate a claimant's credibility as part of her disability determination. As a result, one factor ALJ Whang considered in finding Plaintiff not disabled was Plaintiff's representation of her symptoms. R. at 71. She concluded that Plaintiff was

not fully credible, in part, by evaluating Plaintiff's statements as to the activities Plaintiff participated in and the degree to which her pain limited her. Id. at 71-73. Plaintiff claims that the ALJ's credibility determination is unsupported by substantial evidence. Pl.'s Br. at 20.

Where the ALJ's credibility finding "necessarily contributed to the ALJ's ultimate RFC determination," the Court is required to review it. Fallon v. Colvin, No. 11-CV-1339, 2014 WL 61244, at *5 (N.D.N.Y. 2014) (Kahn, J.). Although the ALJ's credibility assessment receives deference, Barringer, 358 F. Supp. 2d at 81, it still must be supported by substantial evidence, Walsh, 2014 WL 1239117, at *17. An unfavorable credibility finding must include a clear explanation and specific reasons so that a reviewing court can determine with confidence whether the decision's reasoning is supported by substantial evidence. Norman v. Astrue, 912 F. Supp. 2d 33, 43 (S.D.N.Y. 2012) (quoting Urena-Perez v. Astrue, No. 06 Civ. 2589, 2009 WL 1726217, at *40 (S.D.N.Y. Jan. 6, 2009)); see also Nelson v. Astrue, No. 09-CV-00909, 2010 WL 35522304, at *7 (N.D.N.Y. Aug. 12, 2010) (Kahn, J.).

The ALJ is required to evaluate a claimant's subjective complaints for credibility under a two-step test. Barringer, 358 F. Supp. 2d at 81; see also 20 C.F.R. § 404.1529(c)(1). At step one, the ALJ determines whether the medical evidence reveals that a claimant has "a medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." Id. at § 404.1529(c)(1); Barringer, 358 F. Supp. 2d at 81. If it does, the ALJ proceeds to step two and "evaluate[s] the intensity and persistence of [the claimant's] symptoms" in order to see if the claimant's capacity for work is limited. 20 C.F.R. § 404.1529(c)(1). In addition to the objective medical evidence, the ALJ is also instructed to consider: the plaintiff's daily activities; the location, duration, frequency, and intensity of the plaintiff's pain; precipitating and aggravating

factors; the type, dosage, effectiveness and side effects of the plaintiff's medication; other forms of treatment the plaintiff has received; measures the plaintiff has taken to relieve her symptoms; and other factors relating to the plaintiff's pain-induced functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(i)-(vii). These steps help ensure that the credibility finding is in agreement with the evidence. See Walsh, 2014 WL 1239117, at *17 (quoting Williams ex rel. Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988)).

Here, the ALJ included both components of the two-part test in her decision. First, the ALJ stated the evidence supports her finding "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. at 71. Second, she found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the [ALJ's RFC]." Id. The ALJ's credibility determination was based on her findings that: (1) Plaintiff's self-reported daily activities did not support Plaintiff's disability claim; and (2) most of the medical evidence "show[ed] that her pain was manageable with [] pain medications." Id. at 72.

Despite her adherence to the two-part test, the ALJ's credibility determination is not supported by substantial evidence. While the ALJ supported her decision with references to the severity of Plaintiff's pain, medications she took, treatment she received, and her daily activities, the ALJ did not address Plaintiff's testimony from the hearing. Id. at 72-73; see Selinsky v. Comm'r of Soc. Sec., No. 08-CV-1363, 2010 WL 2671502, at *6 (N.D.N.Y. June 14, 2010) ("If an ALJ rejects a claimant's testimony of pain and limitations, he or she must be explicit in the reasons for rejecting the testimony."). A significant reason for giving the ALJ deference as to credibility is that "the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing." Bomeisl v.

Apfel, No. 96 Civ. 9718, 1998 WL 430547, at *6 (S.D.N.Y. July 30, 1998). Although the ALJ listened to Plaintiff's demeanor and testimony at the hearing on relevant credibility issues, the ALJ failed to address them in her decision.

Specifically, the ALJ did not sufficiently address Plaintiff's statements regarding her ability to conduct daily activities. At the hearing, Plaintiff stated she could not drive for more than fifteen minutes without her hands going numb; had difficulty sleeping; and needed her husband's assistance to bring in grocery bags, purchase "heavy stuff," and carry the laundry basket up and down the stairs. Id. at 41-50. While considering Plaintiff's daily activities in the decision, the ALJ referenced only Plaintiff's function report to note "that she can walk without problems, drive, shop for groceries, dust, sweep, and vacuum." Id. at 72. In addition to failing to address Plaintiff's hearing testimony, the ALJ also did not mention Plaintiff's response to a question in the same function report that asked what activities her injuries had prevented her from doing. See id. at 71-73. In the report, Plaintiff listed activities such as driving distances, laundry, housework, and grocery shopping. Id. at 249.

As discussed above, the ALJ also failed to consider Dr. Cambareri's opinion on Plaintiff's limitations. Id. at 71-73. His finding that Plaintiff "can lift very occasionally up to five pounds and carry up to five pounds occasionally" supports Plaintiff's reported restrictions as to grocery shopping and laundry. Id. at 434. Thus, Plaintiff's pain while attempting such activities is corroborated by a treating source. Cf. Kelly v. Comm'r of Soc. Sec., No. 10-CV-0949, 2011 WL 6739516, at *7 (N.D.N.Y. Dec. 5, 2011), report and recommendation adopted by, No. 10-CV-0949, 2011 WL 6739597, at *1 (N.D.N.Y. Dec. 23, 2011) (upholding ALJ's credibility determination when "the record [did] not contain any contrary findings by any health care professional properly

considered under the regulation as a treating source").

As Plaintiff's testimony touched upon factors to be considered in a credibility ruling—namely, intensity of the pain she experienced and how it affected her daily activities–remand is appropriate so that the ALJ can reassess Plaintiff's credibility determination. Although the ALJ did not rely solely on Plaintiff's daily activities in making her credibility determination, she is automatically entitled to a detailed explanation of the ALJ's reasons for discounting her subjective testimony. Sickles v. Colvin, No. 12-CV-774, 2014 WL 795978, at *11 (N.D.N.Y. Feb. 27, 2014) (citations omitted). The ALJ cannot rely on a declaration finding "'[Plaintiff's] statements not fully credible because those statements are inconsistent with the ALJ's own RFC finding.'" White v. Colvin, No. 13-CV-0084, 2014 WL 1311993, at *8 (N.D.N.Y. Mar. 31, 2014) (quoting Ubiles v. Astrue, No. 11-CV-6340, 2012 WL 2572772, at *12 (W.D.N.Y. July 2, 2012)). Therefore, "remand is necessary so that the ALJ may properly assess Plaintiff's credibility in accordance with the regulations and after reexamination of the relevant evidence in the record." Shutts v. Colvin, No. 12-CV-0734, 2013 WL 4080601, at *10 (N.D.N.Y. Aug. 13, 2013).

## V.  CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **VACATED**, and the case is **REMANDED** for a new hearing consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED**.

DATED:      August 14, 2014
               Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge
